**Roger MATTES, Executor of the Estate of Vincent M. Kerrigan, Plaintiff,**

v.

**NATIONAL FIDELITY LIFE INSURANCE COMPANY and Aviation Insurance Agency, Defendants.**

**Civ. No. 79–902.**

United States District Court, M. D., Pennsylvania.

Oct. 2, 1980.

Philip V. Mattes, Scranton, Pa., for plaintiff.

John Q. Durkin, Scranton, Pa., for defendants.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

### I. FACTS

This case concerns the liability of two insurance companies under an occupational "Disability Plan." Plaintiff Roger Mattes, Esq., is the executor for the estate of Vincent M. Kerrigan, a deceased Pan American Airlines pilot. The complainant claims the right to recover $75,000.00, the proceeds from an insurance policy that the decedent purchased from the defendants in 1974. According to the companies, liability is precluded by an exclusion[1] contained in the terms of the agreement. Both the plaintiff and the defendants have requested summary judgment. Resolution of these motions requires a close review of the facts.[2]

The January 1974 Issue of *Aviation Medical Bulletin* carried an advertisement offering active airline pilots a special insurance policy.[3] One side of the page consisted of a picture caricaturing Father Time, replete with hourglass and sickle. The ad contained the following wording opposite the cartoon:

TIME WAITS FOR NO MAN. NOT EVEN PILOTS. Just a year ago this old bird was a baby. And we hope he was good to you in '73.

We also hope your financial circumstances are in good shape for '74. If they're not—if the time has slipped by and you're interested in additional coverage—get in touch with us. Now.

We offer the Watt Plan-airline pilot occupational disability coverage from $25,000.00 to $75,000.00. It's coverage that pays the entire dividend in one tax-free, lump sum (after the specified waiting period) if you're permanently prevented from flying for your airline for medical reasons. (Of course, preexisting conditions are not covered)

Here's another way you can keep up: If you're a new-hire, you can have our full coverage for half-price (a 50% reduction in your premiums) during your first two years with your airline.

For more information, write to Harvey W. Watt, P.O. Box 20787, Atlanta Airport, Atlanta, Georgia 30320. Or call 767–7501. If you're outside Georgia, call toll free: (800) 241–6103. *Aviation Insurance Agency.*

---

1. Actually, the provision cited by the defendants is listed as a "condition." The policy contains a separate set of "exclusions." The defendants, nevertheless, would essentially have the paragraph act as an exclusion since they interpret it to limit their liability. For the purposes of this opinion, terms such as "condition," "exclusion," and "exculpatory clause" shall be used interchangeably.

2. The plaintiff is a resident of Pennsylvania. National Fidelity and Aviation are respectively incorporated in Iowa and Georgia. Subject matter jurisdiction rests on diversity of citizenship. 28 U.S.C. § 1332.

3. *Aviation Medical Bulletin*, which is based in Atlanta, Georgia, is published by defendant Aviation.

*See* Exhibit A attached to Document 19 of the Record. This advertisement apparently attracted Mr. Kerrigan's interest. In February 1974, he mailed a special reply card contained in the *Bulletin* which requested information on both the Disability Plan and a separate "Life Plan."[4] During the following June, the pilot forwarded Aviation the requisite forms for obtaining coverage, and the application was accepted.[5]

In December 1978, Mr. Kerrigan contracted stomach cancer. All parties to the litigation agree that the disease permanently precluded the insured from continuing in his position with Pan American.[6] He died on March 9, 1979. The Disability Plan issued by the defendants extended coverage to any insured "permanently prevented from carrying on his occupation as an airline pilot." *See* the attachment to Document 1 of the Record. The executor demands recovery on the grounds that the latter condition was fulfilled. The defendants, nevertheless, rely on a special provision in the Disability Plan. Condition 6 of the Agreement states the following:

> No claim shall be payable by reason of the death of the insured. In the event death occurs after the expiration of twelve months continuous and uninterrupted medical suspension from flight status, and after the medical referees have determined that disability exists, as provided in Conditions 1, 3, and 4 above, any payment due under this policy shall be made to the estate of the Insured.

National Fidelity and Aviation contend that this clause totally absolves them from liability.

In the view of the defendants, the sixth condition dispels the idea that the Disability Plan was in any way a life insurance policy. The language states that "[n]o claim shall

be payable by reason of the death of the Insured." On this basis, the insurance companies argue that the paragraph excluded coverage for the misfortune that befell Mr. Kerrigan. National Fidelity and Aviation also maintain that the provision limits protection to instances in which the insured suffers from a "disability lasting twelve months." *See* Document 17 of the Record at 2. The decedent's incapacitation did not last a year, because he died four months after the onset of his cancer. Therefore, the companies conclude that they are under no obligation to grant the Kerrigan estate a recovery on the policy.

Counsel for the executor has challenged the insurance companies' position on the ground that Condition 6 does not clearly create a prerequisite that the insured survive the beginning of his or her disability by a year. The plaintiff claims that the provision is ambiguous and thus should be construed against the defendants. The court, moreover, has directed the parties to provide argument on whether or not the circumstances of the case permit the companies to assert Condition 6 as a defense without independent evidence that the terms of the exclusion were orally explained to Mr. Kerrigan. Both questions are now ready for disposition. The plaintiff shall be granted summary judgment.

## II. ALLEGED AMBIGUITY

Without a doubt, all unclear statements contained in an insurance policy must be construed against the insurer. *Central Dauphin School District v. American Casualty Company*, 271 Pa.Super. 218, 412 A.2d 892, 894 (1979). Pennsylvania law is somewhat vague as to the exact standards for determining what constitutes an ambiguity.

---

**4.** The defendants maintain that the "Life Plan" was a life insurance policy. The terms and nature of the plan, however, are not documented in the record. The significance of this Life Plan will be discussed in Part III of the Memorandum. *See* n.8, *infra* and accompanying text.

**5.** The terms of the final agreement, signed on June 26, 1974, are appended to Document 1 of the Record.

**6.** The defendants' Answer, Document 5 of the Record, admits the allegations contained in Paragraph 6 of the Complaint. The latter paragraph contains the allegation of permanent disability.

*See Oliver B. Cannon, Inc. v. Fidelity & Casualty Company*, 484 F.Supp. 1375, 1384–85 n.35 (D.Del.1980). The overall test appears to be whether or not the language in question is capable of "two or more possible meanings." *Brokers Title Company v. St. Paul Fire & Marine Insurance Company*, 610 F.2d 1174, 1178 (3d Cir. 1979).

Judged by this standard, Condition 6 cannot be viewed as ambiguous. The provision clearly states that, by itself, the death of the insured will not qualify for protection under the policy. On the contrary, only a disability that completely prevents a pilot from carrying on his occupation will trigger coverage. It is true that Mr. Kerrigan suffered from such a problem. Nevertheless, the policy also states that payment to the estate of a deceased person will not occur until "after the expiration of twelve months continuous and uninterrupted medical suspension from flight status." Only one logical interpretation of this passage exists, *i. e.*, that the insured must survive the onset of the disability for a year. Any other construction would torture the meaning of the relevant language in contravention of the law of the Commonwealth. *Treasure Craft Jewelers v. Jefferson Insurance Company*, 583 F.2d 650, 652 (3d Cir. 1978).

This reading of the policy, however, does not compel a ruling in favor of the defendants. Indeed, the Pennsylvania Supreme Court has held that in certain circumstances even the clearest of exculpatory clauses must be set aside. This conclusion rests on the conviction that traditional concepts of contract law are not the proper framework for analyzing insurance transactions in which the insured does not share relatively equal bargaining power with the insurer. As the late Justice Manderino stated in *Collister v. Nationwide Insurance Company*, 479 Pa. 579, 593, 388 A.2d 1346 (1978), *cert. denied*, 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979):

Because the insurer is in the business of writing insurance agreements, the recent trend in insurance cases has been away from strict contractual approaches towards a view that insurance policies (and other insurance contracts) are no longer private contracts in the traditional sense (if they ever were). The traditional contractual approach fails to consider the true nature of the relationship between the insurer and its insureds. Only through the recognition that insurance contracts are not freely negotiated agreements entered into by parties of equal status; only by acknowledging that the conditions of an insurance contract are for the most part dictated by the insurance companies and that the insured cannot "bargain" over anything more than the monetary amount of coverage purchased, does our analysis approach the realities of an insurance transaction. [citation omitted]

*See also Brakemen v. Potomac Insurance Company*, 472 Pa. 66, 76, 371 A.2d 193 (1977); *Central Dauphin School District v. American Casualty Company*, 271 Pa.Super. 218, 412 A.2d at 894 n.3.

In view of this situation, the courts of Pennsylvania have devised several special rules designed to protect insurance consumers in given circumstances. One of these doctrines is the *Hionis* principle, which creates an affirmative duty on the part of an insurer to explain the terms of any exclusions in the scope of coverage. As shall be explained, failure to adhere to this duty can deny a company the right to rely on an exculpatory clause.

### III.  DUTY TO EXPLAIN TERMS OF THE EXCLUSION

■ Pennsylvania law requires that an insurer "ordinarily" may not rely on an exclusionary clause as a defense to liability unless it can be established that: (1) the effect of the exemption was explained to the purchaser *and* (2) the insured understood the terms of the provision. *Weiss v. CNA*, 468 F.Supp. 1291, 1293 (W.D.Pa.1979). This rule, of course, places a significant burden on insurance companies. In the instant case, the defendants implicitly admit that they never gave Mr. Kerrigan an oral description or other special interpretation of

Condition 6.[7] Rather, the insurers contend that the duty to explain does not apply under the facts of the suit. Determination of the issue demands a careful analysis of the relevant case law.

The genesis of the disclosure doctrine dates to the decision in *Hionis v. Northern Mutual Insurance Company*, 230 Pa.Super. 511, 327 A.2d 363 (1974). In that case, the plaintiff sued to force an insurance company to pay for the damage caused by a fire that destroyed his restaurant. The defendant argued that a certain clause in the policy substantially reduced its liability by establishing a special calculation for injury to designated improvements of the property. The insured attacked the validity of the calculation. Actually, the holding rendered in *Hionis* was narrow. The majority noted that the terms of the clause in question were very ambiguous. The record demonstrated that the insured had placed "full trust" in the defendant's agent, a personal acquaintance, to obtain adequate coverage. Furthermore, the insurance company offered no evidence that the purchaser was aware of the provision. Under these circumstances, the Superior Court ruled that the clause must be interpreted against the insurer and, thus, construed not to reduce the defendant's duty to pay. *Id.* at 517–18, 327 A.2d 363. Yet the true importance of *Hionis* springs from the following passage:

> When a defense is based on an exception or exclusion in a policy, our Supreme Court has held that such a defense is an affirmative one, and the burden is upon the defendant to establish it. *Even where a policy is written in unambiguous terms, the burden of establishing the applicability of the exclusion or limitation involves proof that the insured was aware*

*of the exclusion or limitation and that the effect thereof was explained to him.* [footnote omitted, emphasis added]

*Id.* at 517, 327 A.2d 363. Our Court of Appeals has accepted this statement as an authoritative explanation of Pennsylvania law. *Daburlos v. Commercial Insurance Company of Newark*, 521 F.2d 18, 24–25 (3d Cir. 1975).

■ Subsequent rulings have recognized two exceptions to the *Hionis* principle. The first exists in situations involving equal bargaining power between the insured and the insurer. *Brokers Title Company v. St. Paul Fire & Marine Insurance Company*, 610 F.2d at 1179–81 concerned a policy extending coverage to a "relatively large title insurance company." One of the exclusionary conditions contained in the contract would have absolved the insurer. Citing *Hionis*, the district court found for the title company on the grounds that the record contained no evidence that the terms of the exclusion had been explained to the purchaser's agent or that the agent had understood the provisions. The Court of Appeals reversed. On behalf of the majority, Judge Aldisert stated that *Hionis* is limited to instances in which the parties lack equal bargaining power and the policy consisted of terms dictated by the stronger. In such situations, the arrangement amounts to an "adhesion contract" and the insured merits special protection. When, however, the record demonstrates that the insurance company and the purchaser stood on comparable footing and were able to negotiate the relevant terms fairly, the *Hionis* rule does not apply. The Court of Appeals found that the title company was in a position to propose more favorable terms and bargain for them. Therefore, the *Hionis* protections were not appropriate.

---

**7.** In a Memorandum and Order dated April 16, 1980, the court directed each party to state if: (1) the *Hionis* rule applied to the instant case and (2) if so, whether there was any evidence that the defendants had complied with its requirements. *See* Document 18 of the Record. In their reply brief, Document 19 of the Record, National Fidelity and Aviation devoted their entire argument to the first question and failed to submit any contentions with regard to the second. The companies, moreover, document-

ed the history of the transaction and indicated that the entire matter was conducted by mail *without maintenance of the Hionis* requirements.

The defendants have had a full opportunity to present proof of compliance with *Hionis*. They have not done so. Indeed, all of the evidence before the court points to a contrary conclusion. Under the circumstances of the case, it is concluded that the companies have conceded non-compliance with the doctrine.

National Fidelity and Aviation cannot find comfort in the *Brokers Title* decision. The opinion clearly leaves *Hionis* intact when the policy in question constitutes an adhesion contract. Judge Aldisert defined the latter term thusly:

> ... Adhesion contracts are not the product of bargaining between the parties but are no more than an offer by one party to the other on a 'take it or leave it' basis. Contract formation under such circumstances is an experience 'not ... of haggle or cooperative process, but rather of a fly and flypaper.' The offeree finds himself virtually compelled by economic necessity to accept a contractual term that he actively opposes, or would actively oppose if he thought opposition not futile. [footnote omitted]

*Brokers Title Company v. St. Paul Fire & Marine Insurance Company*, 610 F.2d at 1179. Judged by this standard, the *Brokers Title* exemption is not applicable.

The record shows that Mr. Kerrigan had no opportunity to negotiate the terms offered by the Disability Plan. His request for information was sent by mail. The conditions of the policy were contained on a printed form provided by the company. The defendants have never suggested that Mr. Kerrigan had an opportunity to offer counter-proposals to any of the provisions. In short, the Disability Plan consisted of terms presented to the purchaser on a "take it or leave it" basis. Mr. Kerrigan had no choice but to accept Condition 6 or forego the coverage offered by the defendants. Such an arrangement is, by definition, an adhesion contract. *Id.* at 1179–80; *Daburlos v. Commercial Insurance Company of Newark*, 521 F.2d at 26; *Hionis v. National Mutual Insurance Company*, 230 Pa.Super. at 516, 327 A.2d 363. The *Hionis* principle, therefore, cannot be affected by application of *Brokers Title.*

A second exception concerns instances in which the facts demonstrate that the insured clearly understood the terms of the exclusion independent of any explanation offered by the insurer. The most notable precedent in this area is *Miller v. The Prudential Insurance Company of America*, 239 Pa.Super. 467, 362 A.2d 1017 (1976). The latter litigation concerned a "major medical" policy designed to pay for expenses in excess of those covered by ordinary insurance. As would be expected in such a situation, the plan excluded liability for expenses already covered by Blue Cross and Blue Shield. The plaintiff-insured attempted to overturn the latter exception. A substantial portion of his medical costs had been underwritten by Blue Cross and Blue Shield. Quite naturally, the insurance company contended that it bore no responsibility with regard to these costs. The insured, however, argued that the exculpatory clause was invalid unless the defendant could demonstrate that the elements of *Hionis* had been satisfied. The Superior Court unanimously disagreed with the plaintiff.

*Miller* distinguished *Hionis* on several grounds. Primarily, the court noted that the very nature of the policy in question was such that the only reason to purchase the protection "must" have been to extend, not duplicate, the coverage offered by other types of insurance. 239 Pa.Super. at 473, 362 A.2d 1017. The insured, therefore, had reason to know that the benefits of the plan he purchased were mutually exclusive from those offered by Blue Cross and Blue Shield. Furthermore, the *Miller* opinion was impressed by the fact that the application for the policy and the terms of the coverage unambiguously informed the purchaser of the exemption. Taken together, these two factors rendered "inequitable" the double recovery that the plaintiff would enjoy through disallowance of the exculpatory clause. *Id.* at 473–74, 362 A.2d 1017. For this reason, the Superior Court affirmed the judgment in favor of the insurance company.[8]

The Court of Appeals for the Third Circuit has had occasion to apply the *Miller* holding. In *Treasure Craft Jewelers v. Jefferson Insurance Company*, 583 F.2d at

---

8. For a case following the *Miller* rationale, *see* *Weiss v. CNA*, 468 F.Supp. at 1291-94.

653–54, the plaintiff had purchased liability insurance for its business operation in Levittown. Subsequently, thieves burglarized the insured's store located in Southampton. The plaintiff sought recovery for the loss from the insurer on the theory that the provision limiting the defendant's responsibility to the Levittown site was invalid under the *Hionis* doctrine. The Court of Appeals, nevertheless, ruled for the insurance company. An analysis of the majority opinion, authored by Judge Hunter, demonstrates that the two essential ingredients for implementation of the *Miller* precedent were present. First, the application and policy terms in *Treasure Craft* clearly set forth the nature of the exemption. *Id.* at 654. Second, the facts of the case were such that the insured had reason to expect such an exemption regardless of the wording contained in the policy.[9] *Id.* at 653–54. Accordingly, the majority decided that, under *Miller*, the plaintiff "as a matter of law ... must be held to have known of the limitation in the policy." *Id.* at 654.

▮▮▮ The preceding authorities establish that two factors must be present before the second exception to *Hionis* can affect the instant litigation. Initially, the terms and structure of the policy must clearly explain the liability exclusion on which the insurance companies intend to rely. In addition, there must be evidence that the insured had notice of the exemption from some source of information outside the policy. If the defendants can establish both of these prerequisites, then an understanding of the exculpatory provision will be imputed to the decedent. *Treasure Craft Jewelers v. Jefferson Insurance Company*, 583 F.2d at 653–54. Conversely, absence of either

component will require application of *Hionis*. For reasons explained in Part II of this Memorandum, the court has concluded that the exemption cited by National Fidelity and Aviation was not ambiguous. Yet *Hionis* must still be followed, because the record contains no support for the conclusion that Mr. Kerrigan had an independent reason to know of the exception.

The defendants rely on the fact that the deceased purchased life insurance at the same time he enrolled in the Disability Plan.[10] This development allegedly renders the instant case analogous to *Miller*. According to the companies, the pilot clearly realized the difference between his disability and life insurance policies and, therefore, had notice of the fact that under the circumstances of his death, he would qualify for the latter coverage but not the former. On this basis, the defendants suggest that Mr. Kerrigan had the independent source of knowledge necessary to satisfy the *Miller-Treasure Craft* test. This argument is not persuasive.

The insurance policies involved in *Miller* were mutually exclusive. As the Superior Court noted, the only purpose for purchasing "major medical" coverage was to guard against expenses not covered by ordinary health insurance, such as Blue Cross and Blue Shield. For this reason, the insured "must" have known that, by its nature, the plan at issue would not reimburse him for expenses guaranteed by other carriers. 239 Pa.Super. at 473, 362 A.2d 1017. Yet the situation is quite different in the present case. The benefits offered by life insurance and the Disability Plan are not such that the insured can only qualify for one type.[11]

**9.** As the majority explained, the Southampton operation had not even been in existence at the time that the plaintiff purchased the coverage. The defendant had had no opportunity to assess risks at the situs and decide if protection should be extended. On this basis, the insured should have expected that the Southampton premises were not covered. During the finalization of the agreement, moreover, the plaintiff made statements indicating that it understood the limitations involved in the arrangement. *Treasure Craft Jewelers v. Jefferson Insurance Company*, 583 F.2d at 654.

**10.** As previously explained, the details of the Life Plan are unclear. The plaintiff, nonetheless, has not denied the existence of such a life insurance policy and, for the purpose of resolving the instant motion, its existence shall be assumed.

**11.** There appears to be no question that National Fidelity and Aviation would have paid the decedent's estate under both policies had the deceased survived the onset of the cancer by a full year.

Thus, it cannot be concluded that Mr. Kerrigan "must" have realized that the exclusion in question existed. The facts do not establish that the decedent had the independent source of knowledge necessary to trigger the *Miller-Treasure Craft* exception.

As previously explained, this court is bound to follow *Hionis.* The defendants have never contended that the requirements of that doctrine were fulfilled. The recognized exceptions to the principle, moreover, do not apply. The court, therefore, concludes that the exculpatory clause cited by the insurance companies cannot be given effect and the plaintiff must be awarded summary judgment.