# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stewart C. Graybill,                     :
                          Appellant      :
                                         :
                  v.                     :      No.  1386 C.D. 2021
                                         :      Argued:  December 15, 2022
North York Borough                       :


BEFORE:     HONORABLE RENÉE COHN JUBELIER, President Judge
            HONORABLE LORI A. DUMAS, Judge
            HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
PRESIDENT JUDGE COHN JUBELIER           FILED: April 3, 2023


Appellant Stewart C. Graybill (Graybill) appeals from the Order entered in the Court of Common Pleas of York County (trial court) on August 20, 2021, granting Appellee North York Borough's (North York) Motion for Summary Judgment and dismissing Graybill's breach of contract claim with prejudice.  On appeal, Graybill argues the trial court erred as genuine issues of material fact existed, the Contract[1] was enforceable, and even if it was not, only the offending provisions should have been declared invalid instead of the entire Contract.  Following our review, we affirm.

---

[1] As discussed more fully below, at issue in this matter is a Labor Management Agreement (LMA) and a Revised Labor Management Agreement (Revised LMA).  Graybill uses the abbreviation "LMA" to encompass both documents.  For clarity, we refer to the LMA and Revised LMA collectively as "the Contract."

## I. BACKGROUND

The trial court aptly sets forth the factual background as follows:

In October 1999, North York hired Graybill as its Borough Manager. Around the sixth anniversary of his employment, North York and Richard Rabuck, Jr. ("Rabuck"), an employee of North York who acted as a representative for all its employees, signed a Labor/Management Agreement Contract ("LMA").

The LMA contains two parts, both of which were drafted by Graybill using language primarily from similar form agreements found online. The First part is a one-page, four paragraph preamble ("Preamble"), which provides that the LMA exists to establish employment procedures, prohibit unilateral amendments by either party as well as "[any] reduction in employee's [sic] during the term of this contract," and would expire on November 30, 2011. The Second part is a thirty-nine page "Employee Policies and Manuals" Handbook ("Employee Handbook"). As to the Second part, page one permits amendments to the LMA only if both parties consented, page twelve under the heading "Performance Improvement" authorizes North York to discharge employees at will, although those "discharged . . . for just cause" are to be provided "due process," and, finally, page sixteen sets forth the procedure and terms for a "reduction in force" or elimination of position(s). The latter reduction/elimination provision includes three years' severance pay for each employee "identified for layoff,"[2] even though "future hires" could not occur until laid-off employees were offered employment again. In preparing the LMA, Graybill may not have sent the Employee Handbook to Gavin Markey, Esq., solicitor for North York (the "Solicitor"), for review or approval.

[2] On a laid-off employee's last day of employment with North York, he was to receive a check in the amount of three years' pay calculated "based on a 40-hour work week at the employee's straight time rate or salary, plus all benefits that the employee would have been entitled to for that three[-]year period. The three years would also included [sic] any anticipated raises or cost of living adjustments under terms or any employee/Borough contractual agreement."

2

Less than four months following the LMA's execution and shortly before Graybill voluntarily resigned to take the same job with Red Lion Borough, the North York Council amended the document via adoption of Resolution 2006-6 ("Revised LMA"). Like the former agreement, Graybill drafted the Revised LMA, which now governed the terms of employment only for employees working at least twenty-two hours per week, reincorporated the Employee Handbook, extended the LMA's terms until December 31, 2018, and barred "reductions in force or lay off's [sic] during the period of this contract." Nevertheless, the Revised LMA increased the Borough Manager's and appointed employees' severance pay to five years of wages and benefits upon layoff, and mandated that the former also receive a "one-time" lump sum payment of $20,000.00 upon termination, plus healthcare benefits for himself and his spouse until their deaths regardless of "retirement, voluntary or involuntary separation."

In June 2006, North York paid Graybill $20,000.00 upon his amicable departure to work for Red Lion Borough, but neither tendered him a check for five years' severance pay nor continued to pay his or his spouse's healthcare costs. Nearly seven years later, North York rehired Graybill as a part-time municipal clerk at an hourly wage of $14.25 to assist the then-acting Borough Manager with administrative and office-keeping matters. Shortly after his rehiring on July 8, 2013, the North York Council attempted to invalidate the Revised LMA through Resolution 2013-1. Then, in October 2013, North York Council voted to terminate Graybill's position and he was dismissed without North York proffering Graybill any payment for severance pay or otherwise.

(Trial Court Opinion (Op.) at 1-3) (footnote omitted.) On December 6, 2013, Graybill filed a Complaint in the trial court against North York, alleging breach of contract or, in the alternative, promissory estoppel due to his termination from the municipal clerk position and requesting three years' severance pay totaling $103,658.29. He also sought specific performance to enforce the perpetual payment of health insurance costs for his spouse and him.

3

North York filed preliminary objections, which the trial court sustained in part and overruled in part.[2]  The trial court sustained the preliminary objection as to the specific performance count and overruled the preliminary objections as to the contract and promissory estoppel counts.  Thereafter, North York filed an answer and new matter, to which Graybill responded, thereby closing the pleadings.  North York subsequently filed a motion for summary judgment, which the trial court denied without prejudice as there was no evidence that Graybill worked sufficient hours, such that he would be subject to the Revised LMA.  In the interim, Graybill withdrew his promissory estoppel claim, leaving just the breach of contract claim.  North York then filed a motion seeking to supplement the record with evidence that Graybill did work sufficient hours to be subject to the Revised LMA and resubmitted its motion for summary judgment.

In its motion for summary judgment, North York asserted that the Contract effectively granted tenure to North York employees, which violates well-established principles.  North York also asserted the Contract unlawfully binds future borough councils.[3]  In opposition, Graybill argued North York Borough Council ultimately approved the Contract and was now trying to deflect blame for not doing their own due diligence.  He also argued that the trial court previously rejected a similar argument when the matter was before it on preliminary objections.

On August 20, 2021, the trial court issued its Order granting summary judgment in North York's favor.  In its opinion accompanying the Order, the trial

---

[2] For purposes of preliminary objections, the trial court consolidated Graybill's case with four other cases involving former North York employees.

[3] In the event the trial court denied its motion for summary judgment, North York also requested the trial court to certify that order for immediate appeal, stating the issue of whether the Contract was enforceable was "pivotal."  (Reproduced Record) (R.R. at 199.)

court set forth the factual background as set forth above,[4] as well as the relevant case law. The trial court stated the issue before it was "purely [a] legal question of whether [it] should ignore a contract's express, plain language which is prohibited by this Commonwealth's law and contravenes public policy to hold that other competing, conflicting terms therein govern the agreement and bestow extraordinary benefits upon the employee who drafted it." (Trial Court Op., Conclusions of Law (COL) ¶ 1.)

The trial court concluded "the Revised LMA is ambiguous because Resolution 2006-6 unequivocally bans any 'reduction in force or lay off's [sic] during the period of this contract' but the Employee Handbook requires a laid-off employee receive 'severance pay ... for (3) years' when 'a reduction in force is necessary or ... one or more positions are eliminated . . . .'" (COL ¶ 2.) The trial court opined that "[c]learly, the Employee Handbook need not describe an employee's lay off benefits when such termination is prohibited." (*Id.*) Thus, the trial court stated that it "must search for the parties' true intent" by "look[ing] to the various actions and inactions of the parties." (COL ¶ 3.) The trial court stated:

> First we note that the revised LMA included specific wording to ban reductions in workforce and layoffs. Furthermore, there would've been no reason to amend the LMA with a Revised LMA with the offending language if Graybill and the union[5] weren't concerned with the possibility that [North York] could still terminate their contracts. This motive is memorialized in Graybill's [d]eposition where he admits that the Revised LMA was developed to prevent Ira Wagner, a former borough employee who was elected to the borough coun[cil], from engaging in a "witch hunt" whereby he would be "arbitrarily wanting to fire every employee all the time."[] While Graybill asserts that

---

[4] The trial court also made separately numbered findings of fact that mirrored its narrative of the facts.

[5] While the trial court refers to a union, employees of North York were not members of a union. (*See* Graybill Dep. at 32, R.R. at 235.)

5

Wagner actually supported the resolution and was the one who seconded the motion, this does not invalidate Graybill's motive at the time of drafting. Similarly, since the 2006 borough council voted to approve both the LMA and Resolution 2006-6, [it] likely subscribed to the ban on layoffs and terminations. However, it is equally clear that the borough coun[cil]'s successors do not subscribe to the ban on layoffs and terminations. As discussed above, when Graybill initially left his position to work for Red Lion, he was given the $20,000 termination lump sum but was not provided with any severance; when Graybill was later fired by a vote of the council, they [sic] provided no severance or termination fee. Regardless of the intent of the current council, our concern is with the intent of the council which adopted the Revised LMA and we hold that they [sic] intended to contract away their [sic] absolute right to fire employees at will, contrary to the laws of our Commonwealth and the explicit holding of *Bolduc* [*v. Board of Supervisors of Lower Paxton Township*, 618 A.2d 1188 (Pa. Cmwlth. 1992)].

(*Id.* (footnote omitted).)

The trial court then considered whether the Revised LMA had to be invalidated in its entirety or whether only the unlawful sections could be stricken. The trial court noted that the Revised LMA did not include a severability clause, although it recognized that the lack of such a clause did not control. (COL ¶ 5.) "However, given the circumstances behind the [R]evised LMA, the current positions of the parties who are subject to the agreement, and the critical nature of the provision [, the trial court concluded it was] unlawful and void," and that "it would be error to retain the remainder of the agreement after striking the unlawful portions." (*Id.*)

Graybill filed a timely appeal of the trial court's August 20, 2021 Order.[6] (R.R. at 467.) The trial court subsequently directed Graybill to file a concise

---

[6] Graybill originally appealed to the Superior Court, which transferred the matter to this Court pursuant to Section 762(a)(7) of the Judicial Code, 42 Pa.C.S. § 762(a)(7), which vests this Court with exclusive jurisdiction of appeals from final orders of courts of common pleas concerning actions against a local government entity. *See* November 5, 2021 Order (per curiam).

statement of errors complained of on appeal (Statement) pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), Pa.R.A.P. 1925(b), which Graybill timely did. (R.R. 471-72.) The trial court addressed Graybill's appeal in its Statement of the Lower Court Pursuant to Pa.R.A.P. 1925(a), filed on November 16, 2021, wherein it indicated that it had "amply set forth" its reasons for decision in its August 20, 2021 Opinion, but it did write separately to rebuke that it "improperly relied on [its] own findings of fact with respect to disputed facts, credibility, intent, and the relative behavior of the parties." (1925(a) Op. at 1-2.) The trial court stated its "findings of fact are based upon specific averments set forth in pleadings filed of record, as cited, and the specific facts [it] used in rendering [its] opinion and order are not contested or in dispute." (*Id.* at 2.)

## II. PARTIES' ARGUMENTS

On appeal, Graybill argues the trial court erred as genuine issues of material fact existed, which precluded entry of summary judgment. He also argues the Contract was enforceable, and even if it was not, only the offending provisions should have been declared invalid instead of the entire Contract.[7] Specifically, Graybill argues that by the trial court's own admission, the record is unclear as to the parties' intent in crafting the Contract, yet the court resolved the ambiguity by analyzing what it deemed to be the parties' intent on an incomplete record and without giving Graybill, as the non-moving party, the benefit on disputed factual issues. Graybill states that the only record evidence relative to the motivation behind the Revised LMA was his own speculation in his deposition testimony that it was to prevent a particular member of Borough Council from arbitrarily terminating North

---

[7] Graybill's arguments have been reordered for ease of discussion.

7

York employees. (Graybill Br. at 9 (citing Graybill Dep. at 55, R.R. at 241)).) Graybill reasons:

> [F]ar from conclusively establishing that [North York] intended to dispense with its at-will employment rights, Graybill's testimony is just as easily read as an indication that [North York] intended to provide incentives to employees whose jobs were being made more difficult by the actions of a member of Borough Council, and to provide some security, through severance benefits, to employees who were at unusual risk of indiscriminate termination.

(Graybill Br. at 13.) Graybill concludes that even if the trial court had not erred in finding the parties had unlawfully intended to restrict North York's ability to terminate employees, the trial court should have invalidated that provision of the Revised LMA while leaving the remainder of the Contract, which includes the severance provisions at issue, intact. (*Id*. at 14-15.)

In response, North York stresses that unless conferred upon by statute, public employers in the Commonwealth do not have the power to enter into employment contracts that prevent them from summarily dismissing their employees at-will, and the Contract essentially grants employees of North York tenure. North York stresses that the LMA contract term, as amended by the Revised LMA, was set to expire on December 31, 2018. Therefore, the Revised LMA both bound successor governing bodies by "creating onerous and prohibitively expensive severance packages for its employees" and restricted North York's ability to summarily dismiss Borough employees by requiring that any change thereto must meet the "approval of *both* parties to this agreement…." (North York's Br. at 17) (emphasis in original.) Thus, North York argues the Contract is void and unenforceable in its entirety. North York also argues that, contrary to Graybill's argument, there are no ambiguities in the Contract requiring a factfinder's resolution as the Revised LMA supersedes the

8

LMA as a matter of law "because it covers the same subject matter as the allegedly conflicting language in the 2005 LMA." (*Id*. at 23 (citations omitted).)

## III. DISCUSSION

An appellate court's standard of review of a trial court's grant of summary judgment is well-settled:

> [A]n appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

*Summers v. Certainteed Corp.*, 997 A.2d 1152, 1159 (Pa. 2010) (citations omitted).

A trial court may grant summary judgment "only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Id*. (citation omitted); *see also* Pa.R.Civ.P. 1035.2.[8] "When considering a motion for summary judgment,

---

[8] Rule 1035.2 of the Pennsylvania Rules of Civil Procedure provides:

After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law

> (1)    whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which would be established by additional discovery . . . , or

> (2)    if, after the completion of discovery relevant to the motion . . . an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

**(Footnote continued on next page…)**

the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party." *Summers*, 997 A.2d at 1159. "In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt." *Id.* (citation and internal quotation marks omitted).

A decision herein requires the interpretation of the Contract. Our Supreme Court has set forth the principles governing contract interpretation as follows:

> The fundamental rule in contract interpretation is to ascertain the intent of the contracting parties. In cases of a written contract, the intent of the parties is the writing itself. Under ordinary principles of contract interpretation, the agreement is to be construed against its drafter. When the terms of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the document itself. When, however, an ambiguity exists, parol evidence is admissible to explain or clarify or resolve the ambiguity, irrespective of whether the ambiguity is patent, created by the language of the instrument, or latent, created by extrinsic or collateral circumstances. A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.

*Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468-69 (Pa. 2006) (citations omitted).

As an initial matter, we agree with the trial court that the Contract is ambiguous. On the one hand, it appears to provide that there can be no reduction in workforce while simultaneously providing for a severance package for employees. North York asserts there is no ambiguity between the 2005 LMA and the 2006

Pa.R.Civ.P. 1035.2.

10

Resolution that revised the LMA because the latter would supersede the former. While this is a correct application of contract principles, here, the conflict does not exist between only those documents. The Revised LMA itself, memorialized in the 2006 Resolution, also contains two contradictory terms: one providing that "[t]here can be no reductions in force or lay off's [sic] during the period of this contract," while also providing for a severance package equal to five years' of full pay and benefits. (R.R. at 62.)

The issue is, however, whether the trial court can resolve that ambiguity on a motion for summary judgment. Ordinarily, the answer would be no, as resolving the ambiguity would be left to the factfinder. *Ins. Adjustment Bureau,* 905 A.2d at 468-69. *See also Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009) (holding same). "[T]he court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact." *City of Philadelphia v. Delaware Cnty. Bd. of Assessment Appeals*, 691 A.2d 992, 995 (Pa. Cmwlth. 1997) (citation omitted).

Importantly here, though, the trial court, at the time it was deciding North York's motion for summary judgment, had before it only Graybill's deposition testimony explaining the intent of the parties in adopting the Contract. At his deposition, following a break, Graybill explained the circumstances surrounding the Contract as follows:

> Going through these documents, and then one of the minutes reflected an individual of council, Ira Wagner. He was an employee of the [B]orough at one time and was terminated, but he did get elected to [B]orough [C]ouncil. That's how these documents came about. It was to prevent Ira from arbitrarily wanting to fire every employee all the time.

11

> I think it was an agreement with the personnel committee and the mayor that we needed some kind of document set forth with things so that he couldn't come to every meeting wanting to fire everybody or go out to where they were working and harass them.

(Graybill Dep. at 55, R.R. at 241.)

Graybill further testified that Wagner's threats to fire people were "[c]onstant[, and h]e was always on a witch hunt; a vendetta." (*Id.*) While Graybill tries to argue before this Court there is a different intent – namely, providing an incentive to employees – no such contrary evidence was presented to the trial court. Thus, there was no conflict in parol evidence for a factfinder to resolve. *City of Philadelphia*, 691 A.2d at 995. Stated another way, there were no genuine issues of material fact that would preclude entry of summary judgment. Summary judgment is appropriate, "if, after the completion of discovery relevant to the motion . . . an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury." Pa.R.Civ.P. 1035.2(2). Graybill, as the plaintiff, bore the burden of proving his contract claim.[9] "Failure of a non-moving party to adduce sufficient evidence on an issue essential to its case and on which it bears the burden of proof such that a jury could return a verdict in its favor establishes the entitlement of the moving party to judgment as a matter of law." *Young v. Dep't of Transp.*, 744 A.2d 1276, 1277 (Pa. 2000). Therefore, the trial

---

[9] Even if we were to view North York as bearing the burden on an affirmative defense that the Contract was void, Graybill still did not adduce evidence before the trial court that there was a genuine issue of material fact. Nor did North York violate the *Nanty-Glo* rule as it did not rely exclusively on oral evidence of its own witnesses; rather, it relied upon Graybill's own testimony at his deposition. *Porterfield v. Trustees of Hosp. of Univ. of Pa.*, 657 A.2d 1293, 1294-95 (Pa. Super. 1995) (applying *Nanty-Glo v. American Surety Co.*, 163 A. 523 (Pa. 1932)).

court did not improperly engage in resolving factual disputes, as there was no factual dispute to resolve.

Having discerned the parties' intent was to prevent reductions in workforce, the trial court properly concluded the provision was void. The barring of any reductions in workforce or layoffs clearly contravenes the well-established principle that boroughs are prohibited from contracting away their absolute right to employ individuals at will. *Stumpp v. Stroudsburg Mun. Auth.*, 658 A.2d 333, 334 (Pa. 1995); *Bolduc*, 618 A.2d at 1190. "In Pennsylvania, public employees are employees-at-will and subject to summary dismissal unless the legislature has explicitly conferred tenure as an integral part of a comprehensive governmental employment scheme." *Bolduc*, 618 A.2d at 1190.

Finally, we consider whether the trial court erred in declaring the entire Contract to be void or whether it should have severed the offending provision and held the remainder of the Contract to be enforceable. While under typical contract principles these may have been viable options, the Courts have not applied this principle in cases, such as this, where the Contract has sought to confer tenure on municipal employees in violation of the right of a municipality to hire and fire at will. In *Bolduc*, the Court held the "contract [wa]s void and unenforceable in its entirety." 618 A.2d at 1191. *See also Falls Township v. McManamon*, 537 A.2d 946, 947-48 (Pa. Cmwlth. 1988) (holding trial court abused its discretion in failing to find entire employment contract invalid as against public policy where new police chief and "lame duck" township supervisors entered into a "midnight [employment] contract," portions of which illegally attempted to bind supervisors' successors in office in their performance of an extremely vital governmental function). Thus, the trial court properly held the entire Contract is void.

13

## IV.  CONCLUSION

Under the caselaw and the unique circumstances presented herein, we find the Contract is invalid and the trial court did not abuse its discretion in granting North York's Motion for Summary Judgment.

_____
**RENÉE COHN JUBELIRER,** President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Stewart C. Graybill,                      :
                    Appellant             :
                                          :
          v.                              :   No.  1386 C.D. 2021
                                          :
North York Borough                        :

# **O R D E R**

**NOW**, April 3, 2023, the Order of the Court of Common Pleas of York County, dated August 20, 2021, is **AFFIRMED**.

_____
**RENÉE COHN JUBELIRER,** President Judge